Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Ryan Goldberg (RG 7570)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY CO.,

Docket No.:_____ (    )

Plaintiff,

-against-

JAMES AVELLINI, M.D.,
JAMI AVELLINI, M.D.,
NILAY SHAH, M.D.,
PROFESSIONAL HEALTHCARE & CHIROPRACTIC
SVC, P.C.,
PROFESSIONAL MEDICAL HEALTHCARE
SERVICE OF NEW YORK, P.C.,
CENTRAL BROADWAY MEDICAL, P.C.,
MEDICAL DIAGNOSTIC SERVICES, P.C.,
MICHAEL CHILLEMI, JR., D.C.,
MICHAEL CHILLEMI, SR.,

**Plaintiff Demands a
Trial by Jury**

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

**NATURE OF THE ACTION**

1.      This action seeks to recover more than $1,240,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent No-Fault charges relating to functional capacity evaluation ("FCE") tests purportedly performed by three "transient" professional corporations, Professional Healthcare & Chiropractic Svc., P.C. ("PHC"), Professional Medical Healthcare Service of New York, P.C. ("PMH"), Central Broadway Medical, P.C. ("CBM") and Medical Diagnostic Services, P.C. ("MDS") (collectively the "PC Defendants"), on  individuals involved in automobile accidents and entitled to no-fault benefits under insurance policies issued by GEICO ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $5,000,000.00 in pending claims relating to the fraudulent FCE tests that have been submitted to GEICO through the PC Defendants.  The PC Defendants purport to be four separate and independently owned professional corporations, but none of them maintain stand-alone practices, none of them have patients of their own and none of them have practicing owners who actually meet with patients, personally render any healthcare services, or practice their profession through the professional corporation. Instead, the PC Defendants are used simply as vehicles to submit bills for inflated and unnecessary fees under New York's "No-Fault" law.

3.      As set forth in more detail below, GEICO is entitled to judgment in this action because:

(ii)    the FCE tests that are billed to GEICO through the PC Defendants are not medically necessary, and are performed – to the extent that they are performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants;

(iii)   the FCE tests that are billed to GEICO through the PC Defendants are unreimburseable under New York law.

(iv)    PMH, CBM and MDS are fraudulently incorporated professional medical corporations truly owned and controlled by non-physicians and, therefore, are ineligible to recover No-Fault benefits;

(v)    PMH, CBM and MDS engage in unlawful fee splitting with non-physicians and, therefore, are ineligible to recover No-Fault benefits;

(vi)    PMH is not presently licensed or authorized to practice medicine by the New York State Education Department;

(vii)    The PC Defendants purport to be owned by healthcare professionals (either by a physician or a chiropractor) but these professionals do not practice through the professional corporation in violation of law; and

4.    The Defendants fall into the following categories:

(i)    The PC Defendants are incorporated New York professional corporations, through which the FCE tests purportedly are performed and billed to insurance companies, including GEICO.

(ii)    James Avellini, M.D. ("Dr. James Avellini"), Jami Avellini, M.D. ("Dr. Jami Avellini"), and Nilay Shah, M.D. ("Dr. Shah) are physicians licensed to practice medicine in New York, who purport to own the PC Defendants (collectively, the "Nominal Owners").

(iii)    Defendants Michael Chillemi, D.C. ("Chillemi, Jr.") and Michael Chillemi, Sr. ("Chillemi, Sr.) are not physicians and never has been licensed to practice medicine in New York. Chillemi, Jr. is a chiropractor who purports to own PHC and who secretly owns and controls PMH and CBM, both of which are professional medical corporations, in violation of New York law, while Chillemi, Sr. secretly owns and controls MDS in violation of New York law. (Chillemi, Jr. and Chillemi Sr. are collectively referred to herein as the "Management Defendants").

5.    As discussed below, Defendants at all relevant times have known that: (i) the Nominal Owners have never truly owned or controlled PMH, CBM and MDS, through which charges for the FCE tests have been submitted; (ii) Chillemi, Jr. and the Nominal Owners have never engaged in the practice of medicine through the PC Defendants; (iv) PMH, CBM and MDS unlawfully split fees or engage in kickback arrangements with the Management Defendants and,

therefore, are ineligible to bill for or to collect no-fault benefits; (v) PMH has no right to receive payment for any pending bills submitted to GEICO because it is not licensed and authorized to practice medicine by the New York State Education Department; (vi) the FCE tests that are billed to GEICO through the PC Defendants are not medically necessary and are ordered and performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants; and (vii) the FCE tests that are billed to GEICO through the PC Defendants are unreimburseable under New York law.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the FCE testing that have been billed to GEICO through the PC Defendants. The charts attached hereto as Exhibit "1" – "4" sets forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO.  The Defendants' fraudulent scheme began as early as 2004 and has continued uninterrupted since that time.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $1,240,000.00.

### THE PARTIES

**I.      Plaintiff**

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co., are all Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.     Defendants**

8.      Defendant Dr. James Avellini, is a physician who has been licensed to practice medicine in New York since October 30, 1981 and served as the nominal or "paper" owner of

4

PMH and CBM.  Dr. James Avellini resides in and is a citizen of New York.. Dr. Avellini is not board certified in any specialty, though he falsely has held himself out as board certified in cosmetic surgery.

9.     Defendant Dr. Jami Avellini resides in and is a citizen of Pennsylvania. Dr. Jami Avellini is a physician who has been licensed to practice medicine in New York since August 27, 2009. Dr. Jami Avellini is listed as an OB/GYN who lives and practices medicine in Pennsylvania.  In 2012, nominal ownership of PMH was transferred to Dr. Jami Avellini and since that time, she has falsely purported to own, control, and practice medicine through PMH when in fact she is only the nominal or "paper" owner of PMH.  Upon information and belief, Dr. Jami Avellini is the daughter of Dr. James Avellini.

10.     Defendant Dr. Shah resides in and is a citizen of New York. Dr. Shah is a physician who has been licensed to practice medicine in New York since March 21, 2013, and purports to own Defendant MDS.

**B.     The PC Defendants**

11.     Defendant PHC is a New York medical professional corporation with its principal place of business in New York. PHC was incorporated in New York on or about December 21, 2004, and has been owned on paper by Chillemi, Jr.

12.     Defendant PMH is a New York medical professional corporation with its principal place of business in New York. PMH was fraudulently incorporated in New York on or about January 26, 2009, has been owned on paper by Dr. James Avellini and subsequently Dr. Jami Avellini, but in actuality always has been owned and controlled by unlicensed non-physicians in contravention of New York law.

13.     Defendant CBM is a New York medical professional corporation with its principal place of business in New York. CBM was fraudulently incorporated in New York on or about February 1, 2010, has been owned on paper by Dr. James Avellini, but in actuality always has been owned and controlled by unlicensed non-physicians in contravention of New York law.

14.     Defendant MDS is a New York medical professional corporation with its principal place of business in New York. MDS was fraudulently incorporated in New York on or about February 20, 2014, has been owned on paper by Dr. Shah, but in actuality always has been owned and controlled by unlicensed non-physicians in contravention of New York law.

**C.     The Management Defendants**

15.     Defendant Chillemi, Jr. resides in and is a citizen of New Jersey. Chillemi is a chiropractor, not a physician, and never has been licensed to practice medicine. Nonetheless, Chillemi secretly has owned, controlled, and derived economic benefit from PMH and CBM in contravention of New York law.  Chillemi, Jr. purports to own PHC.

16.     Defendant Chillemi, Sr. resides in and is a citizen of New Jersey. Chillemi, Sr. is not a physician, and never has been licensed to practice medicine. Nonetheless, Chillemi, Sr. secretly has owned, controlled, and derived economic benefit from MDS in contravention of New York law.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act because they arise under the

laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.**     **An Overview of the No-Fault Laws and Licensing Statutes**

19.     GEICO underwrites automobile insurance in New York.

20.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

21.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

22.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of

Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

23.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

24.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

25.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to conduct a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice a pertinent healthcare profession; (ii) own or control a professional corporation authorized to conduct a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

26.     New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals.

27.    Additionally, New York law requires that the shareholders of a medical professional corporation be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed.

28.    Therefore, under the No-Fault Laws, a professional healthcare corporation is not eligible to receive No-Fault Benefits if, among other things: (i) it is fraudulently incorporated; (ii) it is fraudulently licensed; (iii) it is owned by a physician or professional who does not practice medicine or their applicable profession through it; (iv) it engages in unlawful fee-splitting with unlicensed non-professionals; or (v) it pays or receives unlawful kickbacks in exchange for patient referrals.

29.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

30.    Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss ... directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law ...

31.    Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual

provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

32.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

33.    Beginning in 2004 and continuing through the present day, the Defendants have masterminded and implemented a fraudulent scheme in which the PC Defendants have been used to bill the New York automobile insurance industry millions of dollars for FCE tests for which they have never been eligible for payment.

### A.    Overview of The Fraudulent Scheme

34.    Once the PC Defendants were incorporated and began to provide services, the Management Defendants caused the PC Defendants to operate on a transient basis.  The PC Defendants have never had fixed treatment locations of any kind, have never maintained stand-alone practices, have never owned or leased the locations from which they have purported to provide FCE tests, and have never employed own support staff at the locations where services are rendered.

35.    The PC Defendants do not actually provide FCE tests or any other services from the locations that are listed on their corporate documents or billing submitted to GEICO.  These

locations are used solely by the PC Defendants as billing and general business addresses, not as treatment addresses. Rather, the PC Defendants operate through a network of medical and chiropractic clinics located throughout the greater New York City area that cater to high volumes of individuals that purport to provide care and treatment to individuals involved in low impact motor vehicle accidents (the "Clinics").

36.      Upon information and belief, the PC Defendants obtain access to patients through kickbacks and incentives to the referring providers who provided the patients and the physical locations to perform the services.

37.      The kickbacks provided to obtain referrals for the PC Defendants are disguised as ostensibly legitimate fees to "rent" space or personnel from the referring providers or arrangements involving splitting of fees whereby the referring providers are provided with the means to bill for a portion of the purported testing service.   Specifically, in addition to the kickbacks disguised as "rent," as part and parcel of the scheme, the Management Defendants offered the referring providers the opportunity to submit their own billing for the interpretation portion of the FCE tests, separate and apart from the charges that are submitted through the PC Defendants. The Management Defendants would have the referring provider sign vague and boilerplate prescriptions and letters of medical necessity with the knowledge that they contain misrepresentations and material omissions as the referring providers, usually chiropractors could not prescribe the FCE tests in the first instance.

38.      In order to "market" the FCE tests and in an attempt to legitimize the type of services being provided by the PC Defendants, the Management Defendants created and maintain a series of websites, "www.functionalevaluations.com" (the "Functional Evaluations Website"), and "www.nationalfe.com" ("MDS website") that they use to market the FCE tests that the PC

11

Defendants purport to perform at the Clinics. Both websites describes the FCE tests as "functional evaluations."

39. The Functional Evaluations Website includes a "doctor book" which explains the nature of the FCE tests that the PC Defendants purport to perform, and outline ways that FCE tests can be used outside of the No-Fault context, where the restrictions contained in the Fee Schedule often do not apply. The "doctor book" repeatedly describes the FCE tests as "functional evaluations" and "functional evaluation testing."

40. The Functional Evaluations Website includes a sample FCE test report, which is denominated as a "Functional Evaluation Report." The format of the sample "Functional Evaluation Report," and the types of data that is presented is in all substantive respects identical to the FCE test reports that the PC Defendants submit, or cause to be submitted, in support of their billing. The Functional Evaluations Website also states that such FCE Tests should last approximately 45 minutes. However, GEICO has consistently received billing from the PC Defendants for the performance of FCE test which represents that the tests took more than two hours.

41. The Functional Evaluations Website includes boilerplate letters of medical necessity, prepared by the Management Defendants which falsely states that the FCE services are medically necessary. The Management Defendants provide the letters of medical necessity to the referring providers in order to disguise the fact that the services are not medically necessary. The referring physicians or chiropractors then sign the letter of medical necessity to further the scheme.

42. As part and parcel of the scheme, the Management Defendants have the referring providers order the FCE Test for insureds as a matter of course, despite the fact that (a) they are

not permitted to order the test or the test is impermissibly ordered pursuant to the Ground Rules set forth in the New York Workers' Compensation Fee; (b) the Insureds do not require the FCE Tests and the test is not performed for the purpose set forth in the Fee Schedule; (c) several of the referring providers also bill for an interpretation of the evaluation using the same CPT code as the PC Defendants; and (d) the FCE Tests are known to be medically unnecessary and play no role in the treatment and care of the Insureds.

43.     The pecuniary interest of the Management Defendants is further evident by the fact that they filed for a trademark for "Functional Evaluations." The trademark also includes the "good and services" associated with Functional Evaluations ie: [m]obile medical computerized services, namely, functional assessment for patients receiving medical rehabilitation services for purposes of guiding treatment and assessing program effectiveness." Likewise, the MDS website states that one of the benefits of FCE tests is to "provide legally defensible documentation" for litigation and to "support denial appeals."

44.     In addition, the Management Defendants caused the PC Defendants to submit billing to GEICO which misrepresents the type of services being rendered in order to receive reimbursement for otherwise unreimbursable services. As the FCE tests that are billed to GEICO through the PC Defendants are unreimburseable under New York law, the Management Defendants cause the PC Defendants to submit billing misrepresenting the services being performed, listing them as physical performance testing or range of motion testing, rather than FCE testing.

**B.     The Incorporation and Operation of Professional Healthcare & Chiropractic Svc. P.C.**

45.     PHC was not the Management Defendants first involvement in the scheme, having been involved in similar fraudulent schemes as early as 2001.  In fact, Chillemi, Sr. incorporated an entity knows as Tri-State Diagnostics, Inc. ("Tri-State") in 2001.  Tri-State was incorporated in New Jersey.  Although Chillemi, Sr. is a layperson without any healthcare license, Tri-State provided healthcare services similar to the services that are rendered by the PC Defendants.    In early 2004, Chillemi, Jr. himself caused another medical corporation by the name of TSD of New York, Inc. ("TSDNY") to be incorporated for the purpose of providing transient FCE testing, which later changed its name to Physical Performance Testing of New York. Inc. ("PPTNY").   Chillemi, Jr. operated this business performing transient FCE testing, despite knowing there is no medical utility to such tests.

46.     In an attempt to maximize the illicit profits and expand his scheme, in or about December, 2004, Chillemi, Jr. caused PHC to be incorporated in New York.    Like the predecessor PCs, PHC rendered FCE tests on a transient basis at numerous healthcare facilities throughout New York City and Long Island.  PHC had no fixed treatment location of any kind and obtained access to patients through kickbacks or fee splitting arrangements with the referring providers who provided the patients and the physical locations to perform the services.

47.     GEICO conducted an Examination Under Oath ("EUO") of Chillemi, Jr. on August 25, 2011, in which Chillemi, Jr. gave testimony indicating, among other things, (i) that he did not practice or render services through PHC; (ii) he operates and maintains the Functional Evaluations Website; and (iii) the letters of medical necessity allegedly provided and signed by

the referring provider were created by Chillemi, Jr. and available on the Functional Evaluations website.

48.     In addition, as part of GEICO's investigation, an EUO was conducted of one of the referring providers for PHC.  This provider advised that the services being performed by PHC never lasted longer than 40 minutes per Insured, despite billing submitted representing that the services lasted more than two hours.  Additionally, this provider was unaware that PHC was using an electronic signature to sign his name to documents that were then being submitted to GEICO.

**B.     The Incorporation and Operation of Professional Medical Healthcare P.C.**

49.     In about early 2009, after being investigated for the suspect services being rendered by his PCs, Chillemi, Jr. recruited Dr. James Avellini, a licensed physician, to act as the "front" for a new professional corporation so Chillemi, Jr. could try and conceal his own involvement in the fraud.   Although Avelini had no training in physical and rehabilitation medicine, he knowingly and willingly agreed to "sell" his medical license to Chillemi, Jr. so that PMH could be fraudulently incorporated.  Dr. James Avellini was a perfect candidate for the scheme at the time because he had recently been subjected to public embarrassment from a Fox 5 news report concerning a botched plastic surgery procedure which ultimately limited his employment opportunities in his designated fields of urology and plastic surgery.  See http://www.myfoxny.com/dpp/news/local_news/09117-botched-laser-surgery.   In addition, Dr. James Avellini has been accused of misrepresenting that he was a board certified physician, when in fact, he maintained no board certifications.

50.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing PMH to operate a medical practice,

Chillemi, Jr. entered into a secret scheme with Dr. James Avellini. In exchange for a designated salary or other form of compensation, in early 2009, Dr. James Avellini agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he is the true shareholder, director and officer of PMH and that he truly owns, controls and practices through the professional corporation.  Dr. James Avellini did this knowing full well that PMH would be used as a vehicle to submit fraudulent No-Fault bills relating to FCE tests allegedly provided to Insureds.

51.     Once PMH was fraudulently incorporated on about January 26, 2009, Dr. James Avellini ceded true beneficial ownership and control over the professional corporation to Chillemi, Jr.

52.     Chillemi, Jr. – rather than Dr. James Avellini – provided all start-up costs and investment in PMH. Dr. James Avellini did not incur any costs to establish PMH's practice, nor did he invest any money in the professional corporation he purportedly owns.

53.     To facilitate his interest in and in order to maintain control over PMH, Chillemi, Jr. arranged for PMH to use business addresses, postage meter, and telephone numbers that he – rather than Dr. James Avellini -- owned or controlled and from where Chillemi, Jr. employees worked and operated.

54.     For example, PMH utilized billing addresses of 641 Lexington Avenue, New York, New York ("Lexington Avenue location") and 275 Madison Avenue, 6th Floor, New York, New York ("Madison Avenue location"). PMH has also utilized phone numbers (866) 335-4040 and (800) 381-3108.  These locations and numbers are controlled by Chillemi, Jr. and various companies controlled by him and the Management Defendants.  Additionally, at least one of these phone numbers is listed as the contact number on the Functional Evaluations Website.

55.     Dr. James Avellini never has been the true shareholder, director, or officer of PMH, and never has had any true ownership interest in or control over the professional corporation. True ownership and control over PMH has rested at all times entirely with Chillemi, Jr. who has used the façade of PMH to do indirectly what he is forbidden from doing directly, namely to: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

56.     Throughout the course of Dr. James Avellini's relationship with Chillemi, Jr. all decision-making authority relating to the operation and management of PMH has been vested entirely with Chillemi, Jr. In addition, Dr. James Avellini has neither controlled nor maintained any of PMH's bank accounts, books or records; never has selected, directed, and/or controlled any of the individuals or entities that have been responsible for handling any aspect of PMH's financial affairs; never supervised any of PMH's employees or independent contractors; and has been completely unaware of the most fundamental aspects of how PMH operates.

57.     During his tenure as the paper owner of PMH under the control of Chillemi, Jr. Dr. James Avellini never has been anything more than a de facto employee of Chillemi, Jr.

58.     To conceal his true ownership and control of PMH while simultaneously effectuating pervasive, total control over its operation and management, Chillemi, Jr. arranged to have Dr. James Avellini and PMH enter into a series of "management," "marketing," "lease", "billing", and/or "collections" agreements. These agreements call for exorbitant payments from PMH, in amounts far exceeding PMH's actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of the actual value of the leasehold interests and services that are provided.

17

59.     While these agreements ostensibly have been created by Chillemi, Jr. to provide leasehold, "management," "marketing," and/or "billing" services to PMH, they actually have been used solely as a tool to permit Chillemi, Jr. to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own PMH; and (ii) to siphon the profits that have been generated by the billings submitted to GEICO and other insurers through PMH.

60.     To continue the scheme, nominal ownership of PMH changed to Dr. Jami Avellini on or about October 18, 2012.  As noted above, Dr. Jami Avellini is an OB/GYN practicing and living in Pennsylvania and has never rendered any services for PMH.

61.     By this change of nominal ownership, Dr. Jami Avellini agreed, as did Dr. James Avellini, to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she is the true shareholder, director and officer of PMH and that she truly owns, controls and practices through the professional corporation.  Dr. Jami Avellini did this knowing full well that PMH would be used as a vehicle to submit fraudulent No-Fault bills relating to FCE tests allegedly provided to Insureds.

62.     Throughout the course of Dr. Jami Avellini's relationship with Chillemi, Jr. all decision-making authority relating to the operation and management of PMH has remained vested entirely with Chillemi, Jr. In addition, Dr. Jami Avellini has neither controlled nor maintained any of PMH's bank accounts, books or records; never has selected, directed, and/or controlled any of the individuals or entities that have been responsible for handling any aspect of PMH's financial affairs; never supervised any of PMH's employees or independent contractors; and has been completely unaware of the most fundamental aspects of how PMH operates.

57.     During her tenure as the paper owner of PMH under the control of Chillemi, Jr.
Dr. Jami Avellini had virtually nothing to do with this purported New York healthcare practice,
as she lives and works full-time out-of-state as an OB/GYN.

63.     Further, PMH is not even currently properly licensed with the New York
Department of Education. Pursuant to Education Law §6507(4)(c), the DOE shall issue a
certificate of authority only to a qualified professional service corporation.  Absent a certificate
of authority, a corporation is not entitled to practice medicine.

64.     As part of its investigation, GEICO spoke with Daniel Shapiro, MD ("Dr.
Shapiro") whose name appeared on billing submitted to GEICO by PMH, when it first began
rendering services.  Dr. Shapiro advised that his only role with PMH was the performance of
quality control on PMH's bills and reports.  His arrangement, which was made with Chillemi, Jr.
and not Dr. James Avellini, would be that his name would not appear on any billing or
documents.  Dr. Shapiro resigned from PMH upon realizing Chillemi, Jr. was not abiding by the
agreement.

65.     In response to Dr. Shapiro's resignation, Chillemi, Jr. and PMH hired another
doctor, Yekaterina Slukhinsky ("Dr. Slukhinsky") to act as "quality control."  Like Dr. Shapiro,
Dr. Slukhinsky advised GEICO, her sole role was simply to reviews PMH's FCE billing and
reports.

66.     In addition, GEICO spoke with one of PMH's referring providers.  Like the
provider who referred patients to PHC, the PMH referring provider advised that the services
being performed by PMH never lasted longer than 30 to 45 minutes per Insured and that they
stopped using PMH when they found out that the billing being submitted for the services
indicated that the FCE testing was lasting over two hours.

67.     In addition, like PHC, PMH utilized documents and reports that were prepared by Chillemi, Jr. and linked to and referenced the Functional Evaluations Website.

**C.     The Fraudulent Incorporation and Operation of Central Broadway Medical, P.C.**

68.     In early 2010, in an attempt to reduce the total number of bills being submitted to insurers by the PCs he owned and controlled, Chillemi, Jr. decided to fraudulently incorporate another professional corporation, CBM, under Dr. James Avellini's name.  This was necessary as there were concerns at the time that the volume of fraudulent billing that they were submitting through PMH would draw attention to their scheme, and that the similarities in name between PMH and PHC – together with the fact that the two entities shared an address – would draw attention to his unlawful ownership interest in PMH.  By incorporating a second PC in Dr. James Avellini's name, Chillemi, Jr. could increase the ill-gotten gains, reduce the volume of billing submitted through a single professional corporation, conceal the scheme, and thereby perpetuate the scheme.

69.     Toward that end, Chillemi, Jr. once again approached Dr. James Avellini and offered to purchase the use of his medical license to fraudulently incorporate CBM.

70.     As was the case with PMH, in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing CBM to operate a medical practice, Chillemi, Jr. entered into a fraudulent agreement with Dr. James Avellini. In exchange for a designated salary or other form of compensation, in early 2010 Dr. James Avellini agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of CBM and that he truly owned, controlled and practiced through the professional corporation.

71.    Dr. James Avellini entered into this scheme with Chillemi, Jr. knowing full well that CBM would be used as a vehicle to submit fraudulent No-Fault bills relating to FCE tests allegedly provided to Insureds.

72.    Once CBM was fraudulently incorporated on about February 1, 2010, Dr. James Avellini ceded true beneficial ownership, interest, and control over the professional corporation to Chillemi, Jr.

73.    As with PMH, Chillemi, Jr. – rather than Dr. James Avellini – provided all start-up costs and investment in CBM. Dr. James Avellini did not incur any costs to establish CBM's practice, nor did he invest any money in the professional corporation he purportedly owns.

74.    To facilitate his interest in and control over CBM, as with PMH, Chillemi, Jr. arranged for CBM to use business addresses and telephone numbers that he – rather than Dr. James Avellini – owned, operated and controlled.

75.    As is the case with PMH, Dr. James Avellini never has been the true shareholder, director, or officer of CBM, and never has had any true ownership interest in or control over the professional corporation. True ownership and control over CBM has rested at all times entirely with Chillemi, Jr. who has used the façade of CBM to do indirectly what he is forbidden from doing directly, namely to: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

76.    Throughout the course of Dr. James Avellini's relationship with Chillemi, Jr. all decision-making authority relating to the operation and management of CBM has been vested entirely with Chillemi, Jr. In addition, Dr. James Avellini has neither controlled nor maintained any of CBM's bank accounts, books or records; never has selected, directed, and/or controlled any of the individuals or entities that have been responsible for handling any aspect of CBM's

21

financial affairs; never supervised any of CBM's employees or independent contractors; and has been completely unaware of the most fundamental aspects of how CBM operates.

77.     During his tenure as the paper owner of CBM under the control of Chillemi, Jr. Dr. Avellini never has been anything more than a de facto employee of Chillemi, Jr.

78.     As at PMH, to conceal his true interest and control of CBM while simultaneously effectuating pervasive, total control over its operation and management, Chillemi, Jr. arranged to have Dr. James Avellini and CBM enter into a series of "management," "marketing," "lease", "billing", and/or "collections" agreements.  These agreements call for exorbitant payments from CBM, in amounts far exceeding CBM's actual revenues, for facility lease, equipment lease, and/or the alleged performance of certain designated services including management, marketing, billing, and collections regardless of the actual value of the leasehold interests and services that are provided.

79.     While these agreements ostensibly have been created to permit Chillemi, Jr. to provide leaseholds, "management," "marketing," and/or "billing" services to CBM, they actually have been used solely as a tool to permit Chillemi, Jr. to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own CBM; and (ii) to siphon the profits that have been generated by the billings submitted to GEICO and other insurers through CBM.

80.     To ensure that CBM's profits would be unlawfully diverted to himself, Chillemi, Jr. was so brazen as to file a UCC lien on all of CBM's "Collateral," including, but not limited to, revenues, proceeds, receivables, and bank accounts. A copy of the lien is annexed hereto as Exhibit "5".

**D.      The Fraudulent Incorporation and Operation of Medical Diagnostic Services, P.C.**

81.     New York automobile insurance companies started to become aware of the questionable ownership and control of PMH, as well as CBM and the Management Defendants relationship with the professional corporations performing FCE tests.   As a result, the Management Defendants needed to find an alternative way to continue to generate profits and illegally own and control the medical practices.

82.     To that end, the Management Defendants convinced Dr. James Avellini to "sell" PMH to another medical professional, Dr. Shah.  Dr. Shah, in conjunction with the Management Defendants began utilizing MDS to provide FCE tests at virtually all of the same referring locations as they had with PMH.

83.      Evidencing Dr. James Avellini's lack of control of PMH, not surprising, he was unaware of what he had allegedly "sold" to Dr. Shah.  For example, Dr. Avellini provided testimony to GEICO stating when he sold PMH to Dr. Shah, the sale included the accounts receivable of PMH. However, Dr. Shah provided contradictory testimony to GEICO stating that he only purchased "equipment," "technology," and contacts/referral sources from PMH.

84.     Not surprisingly, other than the nominal change in name and ownership, virtually nothing changed after the "sale" of PMH to Dr. Shah. For example, the Management Defendants caused MDS and Dr. Shah to maintain virtually all of the same: (i) referral locations; (ii) phone numbers; (iii) medical and non-medical employees; (iv) medical and non-medical equipment; (v) administrative office space; and (v) referral sources, as under PMH.

85.     True ownership and control of MDS has rested entirely with the Management Defendants, who used the façade of MDS to do indirectly what they were forbidden from doing

directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

86.    Virtually all decision-making authority relating to the operation and management of MDS has vested entirely with the Management Defendants, specifically, Chillemi, Sr. In addition, Dr. Shah allows Chillemi, Sr. and the administrative staff of MDS – who were hired by the Management Defendants and who have worked with the Management Defendants for years to control or maintain MDS's books and records, including its general ledgers and bank accounts.

87.    As they had done with the previous PC Defendants, the Management Defendants arranged to have Dr. Shah and MDS enter into a series of "management," "billing," "marketing," and/or "lease" agreements with themselves. These agreements called for payments from MDS to the Management Defendants, for the alleged performance of certain designated services including management, marketing, billing, and/or collections regardless of: (i) the volume of MDS's business; or (ii) the income generated by the professional corporation.

88.    To facilitate his interest in and control over MDS, Chillemi, Sr. arranged for MDS to use business addresses, websites and telephone numbers that the Management Defendants – rather than Dr. Shah - owned, operated and controlled.

89.    Throughout the course of Dr. Shah's relationship with Chillemi, Sr. virtually all decision-making authority relating to the operation and management of MDS has been vested entirely with Chillemi, Sr. In addition, Dr. Shah did not have exclusive control or maintain any of MDS' bank accounts, books or records; never selected, directed, and/or controlled any of the individuals or entities that have been responsible for handling any aspect of MDS' financial affairs; and is completely unaware of many of the basic aspects of how MDS operates.

24

90. As with the prior PC Defendants, the net effect of these "management," "billing," "marketing," and/or "lease" agreements between Dr. Shah, MDS, and the Management Defendants was to maintain MDS in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

91. Additionally, Chillemi, Sr. "hired" various individuals to render billing, marketing and administrative services for MDS, who in fact, had been working with the Management Defendants for years, including for PMH and CBM.

92. GEICO conducted an Examination Under Oath ("EUO") of Dr. Shah on October 17, 2014 with respect to MDS, in which Dr. Shah gave testimony, which confirmed his "nominal" ownership of MDS and that the services being rendered by MDS had no medical utility. For example, Dr. Shah gave testimony indicating that:

(i) Despite having an administrative office in Tarrytown, New York, Dr. Shah pays the Management Defendants $2,000.00 per month for use of administrative space in Staten Island, which is owned by the Management Defendants;

(ii) Chillemi, Sr. is the "office manager" of MDS, responsible for "overseeing the business"; "day-to-day billing"; and hiring and firing employees;

(iii) Dr. Shah's could not explain why his purported website listed the same contact number as the one listed on the Functional Evaluations website, owned and controlled by the Management Defendants;

(iv) The individuals who perform "marketing" services for MDS were found by Chillemi, Sr.;

(v) Chillemi, Sr. is an authorized signatory on the MDS bank account;

(vi) Despite allegedly having individuals working for MDS who handle billing, Dr. Shah testified that MDS uses an outside billing company;

25

(vii)   Dr. Shah had absolutely no knowledge of the specific details of MDS' billing agreement with the billing company, including the terms of the agreement, fees, who executed the agreement, or even the name of the billing company;

(viii)  Dr. Shah was unaware Dr. James Avellini is the listed owner of the postage meter used by MDS;

(ix)    Dr. Shah testified MDS performs "functional evaluations";

(x)     MDS technicians perform "NIOSH" testing, evidencing FCE tests are being performed;

(xi)    Dr. Shah does not perform any of the FCE tests on behalf of MDS;

(xii)   MDS will perform FCE tests without reviewing the insured's medical records;

(xiii)  MDS never questions the medical necessity for the referrals for FCE tests.

93.   The PC Defendants, including MDS, were used as vehicles by which the Management Defendants unlawfully split-fees and funneled large sums of money to themselves in contravention of New York law.   This scheme not only unlawfully enriched the Management Defendants, but compromised patient care as the PC Defendants' operations were subject to the pecuniary interests of non-physicians as opposed to the independent medical judgment of true doctor-owners.

**III.   The Nominal Owner's Failure to Practice Medicine Through the PC Defendants**

94.   Chillemi never performed any of the testing or practiced through PHC.

95.   Similarly, Dr. James Avellini, Dr. Jami Avellini and Dr. Shah never practiced medicine through CBM, PMH and MDS, respectively.

96.   N.Y. Business Corporation Law § 1507 makes clear that a shareholder of a medical or other professional corporation must be engaged in the practice of the applicable professional through the professional corporation for it to be lawfully licensed. Section 1507 provides as follows:

**Issuance of shares**

> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued….All shares issued, agreements made, or proxies granted in violation of this section shall be void.

97.     Legislative history confirms that a professional corporation's putative owner not only must be licensed to practice the applicable profession (such as medicine or chiropractic) but must also be engaged in the practice of that profession through the professional corporation. For example, in commenting on the proposed amendment to Section 1507 in 1971, the State Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

98.     Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.

> The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

99.     New York's Department of Health was of the same opinion, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged…. (Emphasis added.)

Copies of the memoranda are annexed hereto as Exhibit "6."

100.   During his EUO, Chillemi testified that the services rendered by PHC are performed by technicians and he does not personally perform any of the services that supposedly are provided through PHC.

101.   Similarly, Dr. James Avellini did not personally perform any of the services that supposedly are provided through PMH and CBM, as he is a urologist and cosmetic surgeon who, during the period in which he purported to own PMH and CBM, devoted his professional energies to a multitude of other professional corporations and business interests rather than PMH and CBM.

102.   Specifically, during the period in which he purported to own PMH and CBM, Dr. James Avellini devoted his time to at least five other medical professional corporations he purported to own and/or provide services through.

103.   In addition, during the time period in which he has purported to own PMH and CBM, Dr. James Avellini provided cosmetic medicine services through, and maintained ownership interests in, a number of cosmetic medicine "spas" in New York and New Jersey.

104.   Similarly, Dr. Jami Avellini is an OB/GYN who lives in and works in Pennsylvania, devoting her time to her practice in that state – and never rendered any services or engaged at all in the practice of medicine with respect to PMH.

105.   In fact, neither Dr. James Avellini nor Dr. Jami Avellini have ever personally treated or provided testing services to any patients of PMH or CBM.  These doctors also have not read or interpreted any of the FCE tests that supposedly are provided through PMH or CBM, have not supervised any of the treatment or testing services allegedly provided to PMH or CBM patients, and have not trained any of the technicians that allegedly perform services for PMH and CBM patients.

106.     Likewise, Dr. Shah, who maintains a private practice in New Jersey, does not perform any of the FCE tests on behalf of MDS.    Additionally, despite testifying that he interprets and scores the FCE tests performed by MDS, there is in fact, no interpretation involved. Rather, the FCE test report is a pre-printed computer generated form, which leaves no sections for interpretation or scoring.    Additionally, MDS does not provide the referring provider with anything but the FCE test report.    In fact, none of the reports submitted by MDS to GEICO contain any evidence that Dr. Shah interpreted or scored the results.

107.     Though the Defendants falsely represent – in some of the billing submitted through the PC Defendants – that the nominal owners supplied some aspect of the FCE tests billed through the PC Defendants, this is not the case.

108.     In actuality, the FCE tests are performed and interpreted – to the extent that they are performed and interpreted at all – by "technicians" associated with the PC Defendants, hired and employed by the Management Defendants and not by the Nominal Owners.

109.     Therefore, the PC Defendants were never eligible in the first instance to bill or receive payment for the Fraudulent Services because the nominal owners never practiced their profession through the professional corporations.

**IV.     The Defendants' Fraudulent Treatment and Billing Protocol**

    **A.     Legitimate Uses and Requirements for FCE Testing**

110.     FCE is a diagnostic test that assesses an individual's physical capacities and functional abilities by matching human performance levels to the demands of a specific occupation or work activity. FCE tests establish the physical level of work an individual can perform and can be useful in determining job placement, job accommodation, or ability to return

to work following an injury or illness. FCE tests also can provide objective information regarding functional work ability for use in determination of an individual's occupational disability status.

111. The New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which governs claims for No-Fault Benefits, makes clear that FCE tests only should be used to determine an individual's ability to assume or return to work. As the Fee Schedule states:

**Indications**

The FCE is utilized for the following purposes:

A) To determine the level of safe maximal function at the time of maximal medical improvement.

B) To provide a pre-vocational baseline of functional capabilities to assist in the vocational rehabilitation process.

C) To objectively set restrictions and guidelines for return to work.

D) To determine whether specific job tasks can be safely performed by modification or technique, equipment or by further training.

E) To determine whether additional treatment or referral to a work hardening program is indicated.

F) To assess outcome at the conclusion of a work hardening program.

112. The Fee Schedule also places certain limits on who may prescribe an FCE test, who may perform an FCE test, and the circumstances under which FCE tests may be performed. Specifically, the Fee Schedule provides that:

(i) FCE tests only may be prescribed by a licensed physician.

(ii) FCE tests only may be performed by: (a) a licensed physical therapist; (b) a licensed occupational therapist; or (c) another licensed healthcare provider qualified by his or her scope of practice, and constant supervision of the FCE test by the licensed provider is required.

(iii) FCE tests may be performed only at the point of maximal medical improvement in the opinion of the attending physician.

30

(iv)     FCE tests may not be prescribed prior to three months post-injury unless there is a significant documented change in the status of the patient which justifies earlier utilization.

(v)      FCE tests only may be performed where the patient: (a) is preparing to return to a previous job; (b) has been offered a new job; or (c) is working with a rehabilitation provider and a vocational objective is established.

**B.      The Referrals For FCE Testing**

113.    As stated above, the PC Defendants have no fixed treatment locations of any kind, do not maintain stand-alone practices and are not the owners or leaseholders in the real property from which they have purported to provide FCE tests.

114.    Based on documentation prepared and provided by the Management Defendants, the referring providers make referrals for medically unnecessary FCE tests and sign boilerplate prescriptions and letters of medical necessity prepared for them by the Management Defendants. In fact, these referrals often contain letterhead listing the Functional Evaluations Website and the referral forms and boilerplate letters are accessible on the website controlled and maintained by Chillemi.

115.     These boilerplate prescriptions and letters of medical necessity do not vary according to any Insured's unique circumstances, and do not disclose any financial incentives that the Defendants possibly provide in exchange for the referrals.

116.     The Management Defendants deliberately prepared the boilerplate prescriptions and letters of medical necessity for the PC Defendants to use, so as to conceal the fact that – in every instance – the FCE tests are unreimburseable because they fail to meet the standards required by the Fee Schedule. Specifically:

(i)      The boilerplate prescriptions and letters of medical necessity, with the exception of the ones utilized by MDS, deliberately omit any reference to

31

the fact that the prescribed tests are FCE tests, and affirmatively misrepresent the FCE tests as "physical performance" tests, in order to conceal the fact that the prescribed tests are FCE tests and therefore are subject to the usage restrictions set forth in the Fee Schedule.

(ii)     The boilerplate prescriptions and letters of medical necessity, with the exception of the ones utilized by MDS, deliberately omit any reference to the fact that the prescribed tests are FCE tests, and affirmatively misrepresent the FCE tests as "physical performance" tests, because most of the referring practitioners are chiropractors or chiropractic professional corporations, not physicians, and therefore cannot prescribe FCE tests in the first instance.

(iii)    The boilerplate prescriptions and letters of medical necessity deliberately omit any information as to whether the FCE tests are prescribed at the Insureds' point of maximal medical improvement in the opinion of the referring party. In fact, the FCE tests are repeatedly prescribed for individual Insureds, as part of a pre-determined protocol, without regard to whether the respective Insureds have achieved maximal medical improvement, and without regard for the opinion of any attending physicians.

(iv)     In many cases, the boilerplate prescriptions and letters of medical necessity deliberately omit any information as to the date of the Insureds' underlying injuries, or the status of the Insureds' recovery, in order to conceal the fact that the FCE tests routinely are prescribed within three months of the Insureds' injuries, and in order to conceal the fact that there have been no significant documented changes in the status of the Insureds which justifies early utilization of the FCE tests.

(v)      The boilerplate prescriptions and letters of medical necessity deliberately omit any information as to the Insureds' vocational status, in order to conceal the fact that: (a) the Insureds are not preparing to return to a previous job; (b) the Insureds have not been offered a new job; and (c) the Insureds are not working with rehabilitation providers toward any established vocational objectives.

117.    The Defendants have the referring practitioners sign the boilerplate prescriptions and letters of medical necessity despite their actual knowledge that the FCE tests are medically unnecessary and are, among other things, duplicative of manual range of motion and muscle

strength tests that the referring practitioners already perform as a matter of course during every meeting with an Insured.

118.    In this context, a traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician, chiropractor or other healthcare provider asks the patient to move his or her joints at various angles, or the physician, chiropractor or other healthcare provider moves the joints for the patient. The physician, chiropractor or other healthcare provider then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

119.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician, chiropractor or other healthcare provider. For example, if a physician, chiropractor or other healthcare provider wanted to measure muscle strength in the muscles surrounding a patient's knee, the healthcare provider would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

120.    Physical examinations performed on Insureds with soft-tissue trauma – the underlying complaint that virtually every Insured advances – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician, chiropractor or other healthcare provider knows the extent of a given Insured's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of any "hands-on" examination of a trauma patient.

121.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial examinations and follow-up examinations.

122.    The referring practitioners prescribe FCE tests for Insureds despite their actual knowledge that the FCE tests that purportedly are performed through the PC Defendants are duplicative of the manual range of motion and muscle tests that they themselves perform on Insureds during initial and follow-up examinations.

123.    The only substantive difference between the FCE tests, and the manual range of motion and manual muscle strength tests performed by the referring practitioners during initial and follow-up examinations, is that the FCE tests generate a digital printout of an Insured's range of motion and muscle strength.

124.    The range of motion and muscle strength data gained through the use of the FCE tests are not significantly different from the information obtained through the manual testing that is part and parcel of the initial examination and follow-up examinations performed by the referring practitioners every time they meet with an Insured.

125.    In the relatively minor soft-tissue injuries allegedly sustained by most of the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing is meaningless. Indeed, this is evidenced by the fact that the referring practitioners rarely incorporated the results of the FCE tests into the rehabilitation programs of any of the Insureds that they purport to treat.

126.    In fact, in many instances the patient charts contained major inconsistencies between the alleged FCE test results and the other provider's examinations and progress notes.

For example, often times the PC Defendants test results would show an increase in range of motion of the patient yet contemporaneous examination notes or progress notes would now diminishments in the patient's range of motion.

127.    In an attempt to conceal the fact that the FCE tests duplicate the manual range of motion and muscle strength tests that the referring practitioners perform during initial and follow-up examinations, the referring practitioners routinely falsely state – in the boilerplate prescriptions and letters of medical necessity, created and dispersed by the Management Defendants – that they do not have the ability to obtain the substantive information provided by the FCE tests through their regular patient examinations.

128.    In actuality, to the extent that the FCE tests provide any information that is pertinent to the referring practitioners' treatment of Insureds, this information can be and is obtained through the manual range of motion and muscle strength tests that are part and parcel of the referring practitioners' regular patient examinations.

### C.    The Fraudulent FCE Tests and Billing

129.    Once the FCE test is prescribed, the Defendants cause the FCE tests to be performed and billed pursuant to a fraudulent protocol designed to maximize the charges that they can submit, or cause to be submitted, to GEICO.

### 1.    Fraudulent Misrepresentation of FCE Tests

130.    The Defendants are well-aware of the fact that the FCE tests they prescribe and purport to perform are unreimburseable under the Fee Schedule.

131.    The Functional Evaluations Website that the Management Defendants use to market the FCE tests that the PC Defendants purported to perform describes the FCE tests as "functional evaluations."

132.    The Functional Evaluations Website includes a "doctor book" which explains the nature of the FCE tests that the PC Defendants purport to perform, and sets forth a large number of ways that FCE tests can be used outside of the No-Fault context, where the restrictions contained in the Fee Schedule often do not apply. The "doctor book" repeatedly describes the FCE tests as "functional evaluations" and "functional evaluation testing."

133.    The Functional Evaluations Website includes a sample FCE test report, which is denominated as a "Functional Evaluation Report." The format of the sample "Functional Evaluation Report" and the types of data presented therein, are in all substantive respects identical to the FCE test reports that the Defendants submit, or cause to be submitted, in support of the PC Defendants' billing.

134.    Likewise, during Dr. Shah's EUO, he repeatedly confirmed that the testing performed by MDS is in fact FCE tests and the MDS website blatantly advertises and  discusses the uses, profitability and performance of FCE tests.

135.    Despite the Defendants blatant marketing of FCE tests, because the Defendants are well-aware of the fact that the tests that they prescribe and purport to perform  are unreimburseable, they go to great lengths to conceal the true nature of the tests in their billing submissions to GEICO.

136.    For instance, in every bill that PHC, CBM and PMH submitted or caused to be submitted for the performance of FCE tests, they deliberately submit the charges under current procedural terminology ("CPT") code 97750, which is the code used for physical performance testing, not FCE testing.

137.    In every bill that MDS submitted or caused to be submitted for the performance of FCE tests, they deliberately submit the charges under current procedural terminology ("CPT")

36

codes 95851, 95852, 95831, and 95832, which are codes used for range of motion and muscle testing, not FCE testing.

138.    Furthermore, the Defendants deliberately submit most of their billing for the performance of FCE tests, or cause it to be submitted, on HCFA-1500 forms, rather than NF-3 forms. The Defendants use HCFA-1500 forms, or cause them to be used, because – unlike NF-3 forms – HCFA-1500 forms do not require healthcare providers to supply a description of the treatment or health service rendered. The Defendants use the HCFA-1500 forms in order to conceal the fact that the tests that they purport to perform are FCE tests.

139.    On rarer occasions, the Defendants have submitted billing for FCE tests, or caused it to be submitted, on NF-3 forms. In such instances, they virtually always falsely describe the FCE tests as "physical performance tests."

140.    Furthermore, PHC, PMH and CBM routinely submitted test reports in support of their billing, or cause them to be submitted, which misrepresent the underlying FCE tests as "physical performance" tests.

141.    Additionally, Chillemi, Jr. testified that when PHC, (like PMH and CBM) purport to perform an FCE test, the resulting FCE test report is made available to the referring practitioner on the Functional Evaluations Website. The reports then are able to be printed and used to support any billing that the referring practitioners might submit for the purported interpretation of the FCE tests.

142.    When the FCE test reports are available on the Functional Evaluations Website, they are denominated as "Functional Evaluation Reports" and indicate that the purpose of the FCE test is to evaluate the Insured's functional capacity.

143.     In instances where the referring practitioners submit the FCE test reports in support of their billing for the purported <u>interpretation</u> of the FCE tests, they generally do not alter them in any way. Thus, they submit FCE test reports which are denominated as "Functional Evaluation Reports," and which indicate that the purpose of the underlying FCE test is to evaluate the Insured's functional capacity.

144.     Contrarily, when PHC, PMH and CBM submitted billing for the purported <u>performance</u> of the FCE tests, or cause it to be submitted, they used a version of the FCE test reports that denominates the test as a "Physical Performance Evaluation Report."

145.     With respect to the reports submitted by PHC, PMH and CBM, the Defendants make extensive changes to the reports, or cause them to be made, to omit many of the references to functional evaluation or occupational considerations. The Defendants make these changes, or cause them to be made, in order to conceal the fact that the tests that are performed are FCE tests and therefore are unreimburseable under the Fee Schedule. For instance:

> (i)     While the FCE test reports submitted by the referring practitioners are denominated as "Functional Evaluation Reports", the FCE test reports submitted by or on behalf of the Defendants are denominated as "Physical Performance Evaluation Reports" – even though they report the same test, on the same Insured, on the same date.

> (ii)    The FCE test reports submitted by or on behalf of the Defendants delete at least two references to "Functional Evaluation" from the FCE test reports submitted by the referring practitioners, and replace them with references to "Physical Performance Evaluation".

> (iii)   The FCE test reports submitted by the referring practitioners typically state that "[Name of Insured] was informed that the Functional Evaluation is comprised of a series of tests designed to measure ones [sic] strength and/or functional abilities." The FCE test reports submitted by or on behalf of the Defendants typically change this language so as to read "Name of Insured] was instructed that the Physical Performance Evaluation is compromised [sic] of a series of tests designed to measure your strength and/or Physical Performance abilities."

(iv)     The FCE test reports submitted by the referring practitioners typically state that the reports can "aid in the facilitation of current goal setting and treatment design", and that they can "document[] progress in response to the patient's rehabilitation program". This language generally is omitted from the FCE test reports submitted by or on behalf of the Defendants which instead posit a phony diagnostic purpose for the testing, namely to "determine what specific muscle and/or nerve roots were impaired".

## 2.    Performance of FCE Tests by Unlicensed Technicians

146.    Though the Fee Schedule requires that FCE tests be performed by (i) a licensed physical therapist; (ii) a licensed occupational therapist; or (iii) another licensed healthcare provider qualified by his or her scope of practice, many of the FCE tests allegedly performed through the PC Defendants, were not performed by licensed healthcare providers of any type.

147.    Rather, many of the FCE tests allegedly performed through the PC Defendants were performed by unlicensed "technicians", who are not healthcare providers and who are not qualified to maintain any sort of healthcare practice.

148.    The technicians who performed the FCE tests that are billed through the PC Defendants are not supervised by any other licensed healthcare providers. Rather, they are simply directed to appear at the Clinics on designated dates, where they purport to perform the FCE tests in the absence of the Defendants.

149.    To conceal the fact that the FCE tests are not performed by licensed healthcare providers, and therefore are unreimburseable under the Fee Schedule, the Defendants routinely falsely represent that a licensed medical professional is the "physician or supplier" of the FCE tests in the billing that they submit, or cause to be submitted, to GEICO.

150.    In addition, the Defendants routine submission of charges on HCFA-1500 forms deliberately omitted any reference to the technicians or individuals who actually purported to perform the FCE tests.

151.    In fact, during his EUO, Chillemi testified that at most, PHC had utilized one licensed physical therapist over the course of time to administer the FCE tests.   Rather, the technicians used by PHC were not licensed and while administering the FCE tests, no other individual from PHC was present with the technician.   This was confirmed by GEICO during conversations and EUOs with referring practitioners.

152.    Additionally, Dr. Shah testified that after he "purchased" PMH, MDS utilized virtually all of the same technicians and individuals to perform the FCE tests who had been rendering the services for PMH.   Many of these individuals, who were identified at the EUO and through documents submitted to GEICO, are not licensed chiropractors who would be certified to perform the FCE tests.

**3.    Performance of FCE Tests Without Regard for Insureds' Vocational Status**

153.    Although the Fee Schedule provides that FCE tests may only be performed only where the Insured: (i) is preparing to return to a previous job; (ii) has been offered a new job; or (iii) is working with a rehabilitation provider and a vocational objective is established, the FCE tests allegedly performed through the PC Defendants are performed – to the extent that they are performed at all – without regard for the Insureds' vocational status.

154.    To conceal the fact that the FCE tests are performed without regard for Insureds' vocational status, and therefore are unreimburseable under the Fee Schedule, the Defendants, routinely omit any information regarding the Insureds' vocational status from the FCE test reports that they submit, or cause to be submitted, in support of the PC Defendants' billing.

40

4.     **Performance of FCE Tests Without Regard for Insureds' Medical Improvement**

155.   In keeping with the fact that FCE tests are intended to determine an Insured's ability to commence or return to work, the Fee Schedule provides that FCE tests only may be performed at the point of maximal medical improvement in the opinion of the attending physician.

156.   Because an Insured is unlikely to achieve maximal medical improvement immediately after their accident, the Fee Schedule provides that FCE tests should not be performed prior to three months post-injury unless there is a significant documented change in the status of the patient which justifies earlier utilization.

157.   Because an Insured only can achieve maximal medical improvement from a single accident on a single occasion, FCE tests should be performed only once with respect to any given Insured following any single accident.

158.   Even so, the Defendants routinely prescribe and purport to perform and interpret several FCE tests for each Insured following a single accident, with the first and – in many cases – the second such FCE tests performed less than three months following the respective Insureds' accidents.

159.   The Defendants routinely prescribe and purport to perform and interpret these FCE tests without regard for any Insured's medical improvement.

160.   To conceal the fact that the FCE tests are performed and interpreted – to the extent that they are performed and interpreted at all – without regard for Insureds' medical improvement, and therefore are unreimburseable under the Fee Schedule, the Defendants

routinely omit any information regarding the Insureds' recovery status from the FCE test reports that they submit, or cause to be submitted, in support of the PC Defendants' billing.

**5.     Performance of Multiple FCE Tests on Individual Insureds**

161.    Because the Fee Schedule provides that FCE tests may be performed only at the point of maximal medical improvement in the opinion of the attending physician, only one FCE test may be performed on any given Insured following any individual accident.

162.    Even so, in order to maximize the fraudulent billing that they can submit, or cause to be submitted, to GEICO, the Defendants routinely prescribe and purport to perform and interpret multiple FCE tests on each Insured.

163.    The Defendants circumvent the Fee Schedule's single FCE test restriction by deliberately performing multiple FCE tests and submitting billing for physical performance testing, muscle testing or range of motion testing, which are not subject to the Fee Schedule's single-test restriction for FCE tests.

164.    Then, in exchange for financial incentives from the Defendants or the opportunity to submit separate charges for the interpretation of the FCE tests, the referring practitioners sign boilerplate letters of medical necessity, prepared by the Management Defendants.

165.    The Defendants prepare these letters of medical necessity, and the referring practitioners sign them, even though: (i) they know that the first FCE tests that are prescribed and purportedly performed are unreimburseable under the Fee Schedule, and any additional FCE tests likewise are unreimburseable under the Fee Schedule; (ii) they know that the FCE tests are medically unnecessary and are duplicative of the manual range of motion and muscle strength tests that the referring practitioners already perform during their regular examinations of the

42

Insureds; and (iii) they do not actually know whether additional testing of any kind will be indicated for Insureds five weeks in the future.

**6.    Fraudulent Inflation of FCE Test Billing**

166.    Not only do the Defendants prescribe and purport to perform and interpret unreimburseable, medically unnecessary FCE tests, the Defendants routinely inflate the charges that they submit, or cause to be submitted, for the performance of the tests.

167.    Pursuant to the Fee Schedule, the proper CPT code for an FCE test is CPT code 97800.

168.    However, the Defendants deliberately do not submit their charges for FCE tests under CPT code 97800, because – if they did so – they would have to admit that the tests they prescribe and purport to perform and interpret are FCE tests, and they would have to admit that the tests that they purport to perform do not meet the Fee Schedule reimburseability requirements.

169.    Instead, the billing submitted by PHC, PMH and CBM was submitted under CPT code 97750, which is the code used for physical performance testing, not FCE testing.

170.    CPT code 97750 is a "per time" code, which in New York permits a discrete charge of $45.71 for every 15 minutes that a provider spends on a test.

171.    When a healthcare provider submits a charge under CPT code 97750, they represent that they have prepared a written report interpreting the test results.

172.    In virtually every bill for the performance of the FCE tests that was submitted by PHC, PMH and CBM, the Defendants falsely state that the FCE tests took 150 minutes to perform. At $45.71 for every 15 minutes of testing, in virtually every case this results in charges of $457.10 for the performance of each FCE test.

173.     In actuality, the FCE tests – to the extent that they are performed at all – never take more than 30-45 minutes to perform.  In fact, GEICO obtained insured's statements, who advised that the FCE test never lasted more than 30-40 minutes.  Additionally, GEICO obtained statements from multiple referring practitioners that advised that the FCE tests performed by PHC, PMH and CBM did not last longer than 30-45 minutes.

174.     In virtually every bill for the performance of the FCE tests that were submitted by PHC, PMH and CBM, the Defendants falsely represent that they have prepared a written report interpreting the test results.

175.     Likewise, MDS, did not submitting billing for the FCE tests under CPT 97780, but instead submitted billing under CPT codes 95851, 95852, 95831, and 95832, which are codes used for range of motion and muscle testing, not FCE testing.

176.     In addition to deliberately mischaracterizing the services being billed, in order to maximize the fraudulent billing, MDS unbundled multiple charges of $45.71 under CPT codes 95851 and 95852; multiple charges of $43.60 under CPT code 95831; and multiple charges of $49.26 under CPT code 95832, resulting in charges in excess of $700.00 per insured per FCE test.

177.     Further, the Defendants nor any other physician or healthcare provider associated with the PC Defendants ever prepared a written report interpreting the FCE test results. The reports generated by the PC Defendants contain no interpretation whatsoever, and consist of nothing more than the raw data from the testing, together with boilerplate explanations of the general nature of purpose of the testing that do not vary from Insured to Insured.   As Chillemi testified at his EUO, the report generated by the technician upon completion of the FCE test is simply uploaded to the Functional Evaluations Website.

44

V.   **The Fraudulent NF-3 and HCFA-1500 Forms Submitted to GEICO**

178.   To support the fraudulent charges, statutorily prescribed claim forms for No-Fault

Benefits (i.e. NF-3 and HCFA-1500 Forms) consistently have been submitted to GEICO by and

on behalf of the Defendants seeking payment for services for which the PC Defendants are

ineligible to receive payment.

179.   The NF-3 and HCFA-1500 Forms submitted to GEICO by and on behalf of the

Defendants are false and misleading in the following material respects:

(i)     The NF-3 and HCFA-1500 Forms submitted through PMH, CBM and
MDS uniformly misrepresent to GEICO that the PC Defendants are
lawfully licensed, and therefore, eligible to receive No-Fault Benefits
pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-
3.16(a)(12). In fact, PMH, CBM and MDS are not properly licensed in
that they are medical professional corporations that were unlawfully
incorporated and which, in reality, have been owned and controlled by the
Management Defendants who are not physicians and who owned and
controlled the PC Defendants for their economic benefit, while designating
Dr. James Avellini, Dr. Jami Avellini, and Dr. Shah "nominal" or "paper"
owners.

(ii)    The NF-3 and HCFA-1500 Forms submitted through PMH, CBM and
MDS uniformly misrepresent to GEICO that the PC Defendants are
lawfully licensed, and therefore, eligible to receive No-Fault Benefits
pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-
3.16(a)(12). In fact, PMH, CBM and MDS are not properly licensed in
that they are medical professional corporations that engage in unlawful fee
splitting with the Management Defendants.

(iii)   The NF-3 and HCFA-1500 Forms submitted through the PC Defendants
uniformly misrepresent to GEICO that the PC Defendants are lawfully
licensed, and therefore, eligible to receive No-Fault Benefits pursuant to
Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact,
the PC Defendants are not properly licensed in that they are not, and never
have been, owned by individuals who actually practice medicine through
the professional corporations.

(iv)    The NF-3 and HCFA-1500 Forms submitted through the PC Defendants
uniformly misrepresent to GEICO that the FCE tests are medically
necessary, and that the FCE tests are ordered and performed in accordance

45

with the requirements set forth in the Fee Schedule, and therefore are reimburseable. In fact, the FCE tests are not medically necessary, are not ordered or performed in accordance with the requirements set forth in the Fee Schedule, and therefore are not reimburseable.

(v)     The NF-3 and HCFA-1500 Forms submitted through PMH uniformly misrepresent to GEICO that PMH is properly authorized to practice medicine by the New York State Education Department. In fact, PMH is in violation of Education Law §6507(4)(c) and is not properly licensed to practice medicine in the State of New York.

## VI.     The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

180.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

181.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

182.    Specifically, they knowingly have misrepresented and concealed facts related to PMH, CBM and MDS in an effort to prevent discovery that the professional service corporations are unlawfully incorporated, owned and controlled by the Management Defendants, purport to be owned by physicians or who does not practice through the professional corporations, engage in fee splitting, and therefore are ineligible to bill for or collect No-Fault Benefits.

183.    In addition, the Management Defendants entered into complex financial arrangements with PMH, CBM and MDS and the nominal owners that were designed to, and did, conceal his true ownership of and control over PMH, CBM and MDS.

184.    Likewise, the Defendants knowingly have misrepresented and concealed facts relating to the nature of the FCE tests in order to conceal the fact that the FCE tests are, in fact,

FCE tests and therefore are unreimburseable to the extent that the Defendants actually perform and interpret them at all.

185.   Moreover, in Defendants have misrepresented and concealed facts in a calculated effort to prevent GEICO from discovering that the FCE tests are medically unnecessary.

186.   GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

187.   In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the PC Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

188.   The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

189.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,240,000.00 based upon the fraudulent charges.

190.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the PC Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

191.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 190 above.

192.     There is an actual case in controversy between GEICO and the PC Defendants regarding more than $5,000,000.00 in fraudulent billing that has been submitted to GEICO.

193.     The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because PMH, CBM and MDS are fraudulently incorporated professional medical corporations truly owned and controlled by non-physicians and, therefore, are ineligible to recover No-Fault benefits.

194.     PMH has no right to receive payment for any pending bills submitted to GEICO because PMH is not presently licensed or authorized to practice medicine by the New York State Education Department.

195.     PMH, CBM and MDS have no right to receive payment for any pending bills submitted to GEICO because they engage in unlawful fee splitting with non-physicians and, therefore, are ineligible to recover No-Fault benefits.

196.     The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they purport to be owned by individuals who do not practice

medicine or chiropractic through the professional corporations and, therefore, are ineligible to recover No-Fault benefits.

197.     The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the FCE tests that are billed to GEICO through the PC Defendants are not medically necessary, and are performed – to the extent that they are performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

198.     The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the FCE tests that are billed to GEICO through the PC Defendants are unreimburseable under New York law.

199.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     PMH, CBM and MDS have no right to receive payment for any pending bills submitted to GEICO because PMH, CBM and MDS are fraudulently incorporated, owned and/or controlled by non-physicians and, therefore, are ineligible to seek or recover No-Fault Benefits;

(ii)     PMH, has no right to receive payment for any pending bills submitted to GEICO because PMH is not properly licensed with the State of New York Education Department;

(iii)     PMH, CBM and MDS have no right to receive payment for any pending bills submitted to GEICO because these professional corporations engage in unlawful fee-splitting with non-physicians;

(iv)     The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because these professional corporations are not, and never have been, owned by physicians who actually practice medicine or chiropractic through the professional corporations;

(v)     The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the FCE tests that are billed to GEICO through the PC Defendants are not medically necessary, and are performed – to the extent that

they are performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants; and

(vi)     The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the FCE tests that are billed to GEICO through the PC Defendants are unreimburseable under New York law.

## SECOND CAUSE OF ACTION
### Against PHC and Chillemi, Jr.
### (Common Law Fraud)

200.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 199 above.

201.     PHC and Chillemi, Jr. intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

202.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that PHC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was not properly licensed in that it was owned by an individual who did not practice medicine through the professional corporation; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (iii) in every claim, the representation that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided. A representative sample of the

fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the fraudulent scheme identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

203.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through PHC that were not compensable under the No-Fault Laws.

204.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $775,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through PHC.

205.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

206.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against PHC and Chillemi, Jr.
### (Unjust Enrichment)

207.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 206 above.

208.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

209.    When GEICO paid the bills and charges submitted by or on behalf of the Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

210.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

211.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

212.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $775,000.00.

### THIRD CAUSE OF ACTION
**Against PMH, Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini
(Common Law Fraud)**

213.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 212 above.

214.    PMH, Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

215.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that PMH was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by a non-physician; (ii) in every claim, the representation that PMH was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation is not properly licensed in that it engages in illegal fee-splitting with a non-physician; (iii) in every claim,

the representation that PMH was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was not properly licensed in that it was owned by individuals who did not practice medicine through the professional corporation; (iv) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (v) in every claim, the representation that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (vi) in every claim, the representation that PMH was properly licensed with the New York State Department of Education when in fact it was not licensed and therefore, could not practice medicine in the State of New York.

216.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through PMH that were not compensable under the No-Fault Laws.

217.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $217,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through PMH.

218.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

219.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against PMH, Chillemi, Jr. Dr. James Avellini and Dr. Jami Avellini
### (Unjust Enrichment)

220.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 219 above.

221.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

222.    When GEICO paid the bills and charges submitted by or on behalf of the Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

223.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

224.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

225.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $217,000.00.

**SIXTH CAUSE OF ACTION**
**Against Chillemi, Jr. Dr. James Avellini and Dr. Jami Avellini**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

226.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 225 above.

227.    PMH is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

228.    Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini knowingly have conducted and/or participated, directly or indirectly, in the conduct of PMH's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for over five years seeking payments that PMH was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engages in fee-splitting with a non-physician; (iii) PMH is owned on paper by physicians who never engaged in the practice of medicine through the professional corporation; (iv) PMH is not licensed with the Department of Education; (v) PMH represented that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (vi) PMH represented that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided. A representative sample of the fraudulent bills and corresponding

mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

229.    PMH's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini operated PMH, insofar as PMH never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for PMH to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to bill for service and attempt collection on the fraudulent billing submitted through PMH to the present day.

230.    PMH is engaged in inherently unlawful acts, inasmuch as its very corporate existence was an unlawful act, considering that it was fraudulently incorporated, owned and controlled by non-physicians while designating a physician as the nominal owner, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts are taken by PMH in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

231.    GEICO was injured in its business and property by reason of the above-described conduct in that it paid at least $217,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through PMH.

232.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini
### (Violation of RICO, 18 U.S.C. § 1962(d))

233.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 232 above.

234.    PMH is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

235.    Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini, are employed by and/or associated with the PMH enterprise.

236.    Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini, knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of PMH's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for over five years seeking payments that PMH was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engages in fee-splitting with a non-physician; (iii) PMH is owned on paper by physicians who never engaged in the practice of medicine through the professional corporation; (iv) PMH is not licensed with the Department of Education; (v) PMH represented that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (vi) PMH represented that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of

the Fraudulent Services that purportedly were provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

237.    Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini, knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

238.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $217,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through PMH.

239.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against CBM, Chillemi, Jr., and Dr. James Avellini
### (Common Law Fraud)

240.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 239 above.

241.    CBM, Chillemi, Jr., and Dr. James Avellini intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

242.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that CBM was properly licensed, and

therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by a non-physician; (ii) in every claim, the representation that CBM was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation is not properly licensed in that it engages in illegal fee-splitting with a non-physician; (iii) in every claim, the representation that CBM was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was not properly licensed in that it was owned by individuals who did not practice medicine through the professional corporation; (iv) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; and (v) in every claim, the representation that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

243.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CBM that were not compensable under the No-Fault Laws.

244.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $122,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through CBM.

245.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

246.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against CBM, Chillemi, Jr., and Dr. James Avellini**
**(Unjust Enrichment)**

247.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 246 above.

248.   As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

249.   When GEICO paid the bills and charges submitted by or on behalf of the Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

250.   The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

251.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

252.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $122,000.00.

**TENTH CAUSE OF ACTION**
**Against Chillemi, Jr. and Dr. James Avellini**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

253.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 252 above.

254.    CBM is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

255.    Chillemi, Jr. and Dr. James Avellini knowingly have conducted and/or participated, directly or indirectly, in the conduct of CBM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for over three years seeking payments that CBM was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engages in fee-splitting with a non-physician; (iii) CBM is owned on paper by physicians who never engaged in the practice of medicine through the professional corporation; (iv) CBM represented that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (v) CBM represented that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of

racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

256.    CBM's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Chillemi, Jr., and Dr. James Avellini operated CBM, insofar CBM never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for CBM to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to bill for service and attempt collection on the fraudulent billing submitted through CBM to the present day.

257.    CBM is engaged in inherently unlawful acts, inasmuch as its very corporate existence was an unlawful act, considering that it was fraudulently incorporated, owned and controlled by non-physicians while designating a physician as the nominal owner, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts are taken by CBM in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

258.    GEICO was injured in its business and property by reason of the above-described conduct in that it paid at least $122,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through CBM.

259.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Chillemi, Jr. and Dr. James Avellini**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

260.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 259 above.

261.    CBM is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

262.    Chillemi, Jr. and Dr. James Avellini are employed by and/or associated with the CBM enterprise.

263.    Chillemi, Jr. and Dr. James Avellini, knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of CBM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for over three years seeking payments that CBM was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engages in fee-splitting with a non-physician; (iii) CBM is owned on paper by physicians who never engaged in the practice of medicine through the professional corporation; (iv) CBM represented that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (v) CBM represented that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided. A representative sample of the fraudulent

bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

264.     Chillemi, Jr. and Dr. James Avellini knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

265.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $122,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through CBM.

266.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against MDS, Chillemi, Sr., Chillemi, Jr., and Dr. Shah**
**(Common Law Fraud)**

267.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 266 above.

268.     MDS, Chillemi, Sr., Chillemi, Jr., and Dr. Shah intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

269.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that MDS was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by a non-physician; (ii) in every claim, the representation that MDS was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation is not properly licensed in that it engages in illegal fee-splitting with a non-physician; (iii) in every claim, the representation that MDS was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was not properly licensed in that it was owned by individuals who did not practice medicine through the professional corporation; (iv) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (v) in every claim, the representation that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

270.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through MDS that were not compensable under the No-Fault Laws.

271.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $125,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through MDS.

272.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

273.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
### Against MDS, Chillemi, Sr., Chillemi, Jr., and Dr. Shah
### (Unjust Enrichment)

274.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 273 above.

275.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

276.    When GEICO paid the bills and charges submitted by or on behalf of the Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

277.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

278.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

279.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $125,000.00.

## FOURTEENTH CAUSE OF ACTION
### Against Chillemi, Sr. Chillemi, Jr., and Dr. Shah
### (Violation of RICO, 18 U.S.C. § 1962(c))

280.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 279 above.

281.    MDS is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

282.    Chillemi, Sr. Chillemi, Jr., and Dr. Shah knowingly have conducted and/or participated, directly or indirectly, in the conduct of MDS' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over one year seeking payments that MDS was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engages in fee-splitting with a non-physician; (iii) MDS is owned on paper by physicians who never engaged in the practice of medicine through the professional corporation; (iv) MDS represented that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (v) MDS represented that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of

racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

283.    MDS' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Chillemi, Sr., Chillemi, Jr., and Dr. Shah operated MDS, insofar MDS never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for MDS to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to bill for service and attempt collection on the fraudulent billing submitted through MDS to the present day.

284.    MDS is engaged in inherently unlawful acts, inasmuch as its very corporate existence was an unlawful act, considering that it was fraudulently incorporated, owned and controlled by non-physicians while designating a physician as the nominal owner, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. These inherently unlawful acts are taken by MDS in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

285.    GEICO was injured in its business and property by reason of the above-described conduct in that it paid at least $125,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through MDS.

286.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against Chillemi, Sr. Chillemi, Jr., and Dr. Shah**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

287.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 286 above.

288.    MDS is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

289.    Chillemi, Sr., Chillemi, Jr., and Dr. Shah are employed by and/or associated with the MDS enterprise.

290.    Chillemi, Sr., Chillemi, Jr., and Dr. Shah, knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of MDS' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three years seeking payments that MDS was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engages in fee-splitting with a non-physician; (iii) MDS is owned on paper by physicians who never engaged in the practice of medicine through the professional corporation; (iv) MDS represented that the billed-for services were medically necessary, when in fact the billed-for services were FCE tests that were not medically necessary and were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; and (v) MDS represented that the bills and treatment reports accurately reflect the level of the Fraudulent Services, when in fact the NF-3 forms and treatment reports uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided. A representative sample

of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

291.    Chillemi, Sr., Chillemi, Jr., and Dr. Shah knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

292.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $125,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through MDS.

293.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

294.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO for FCE tests or FCE test interpretation;

B.    On the Second Cause of Action against PHC and Chillemi, Jr. compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $775,000.00,

70

together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  C. On the Third Cause of Action against PHC and  Chillemi, Jr. compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $775,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  D. On the Fourth Cause of Action against PMH, Chillemi, Jr.,  Dr. James Avellini and Dr. Jami Avellini, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $217,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  E. On the Fifth Cause of Action against PMH, Chillemi, Jr.,  Dr. James Avellini and Dr. Jami Avellini, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $217,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  F. On the Sixth Cause of Action against Chillemi, Jr., Dr. James Avellini and Dr. Jami Avellini, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $217,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  G. On the Seventh Cause of Action against Chillemi, Jr.,  Dr. James Avellini and Dr. Jami Avellini, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $217,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

71

H.      On the Eight Cause of Action against CBM, Chillemi, Jr., and Dr. James Avellini, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $122,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against CBM, Chillemi, Jr., and Dr. James Avellini, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $122,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Chillemi, Jr., and Dr. James Avellini, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $122,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Chillemi, Jr., and Dr. James Avellini, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $122,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against MDS, Chillemi, Sr., Chillemi, Jr., and Dr. Shah, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $125,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against MDS, Chillemi, Sr., Chillemi, Jr., and Dr. Shah, compensatory damages in favor of GEICO an amount to be determined at trial but in

72

excess of $125,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N.     On the Fourteenth Cause of Action against Chillemi, Sr., Chillemi, Jr.,  and Dr. Shah, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $125,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.     On the Fifteenth Cause of Action against Chillemi, Sr., Chillemi, Jr.,  and Dr. Shah, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $125,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: July 10, 2015

RIVKIN RADLER LLP

By:_____
     Barry I. Levy (BL 2190)
     Michael A. Sirignano (MS 5263)
     Ryan Goldberg (RG 7570)
926 RXR Plaza
Uniondale, New York 11556-0926
Telephone:     (516) 357-3000
Facsimile:     (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*